435 P.2d 472

**Victor F. MUELLER and Estelle Mueller, his wife et al., Appellants,**

v.

**CITY OF PHOENIX ex rel. PHOENIX BOARD OF ADJUSTMENT II, Appellees.**

No. 8512.

Supreme Court of Arizona, In Banc.

Dec. 11, 1967.

Murphy, Posner & Franks, by, John R. Franks, Phoenix, for appellants.

Merle L. Hanson, City Atty., Robt. J. Backstein, Asst. City Atty., Phoenix, for City of Phoenix, ex rel. Board of Adjustment II, for appellees.

UDALL, Justice.

The instant matter is before this Court on appeal from the Superior Court judgment entered in favor of the appellee City of Phoenix Board of Adjustment, hereinafter referred to as Board. The appellants are a large group of residents and property owners in the Rancho Solano area of north Phoenix whose properties lie in the immediate general vicinity of the subject property, Arizona Ranch House Inn.

This matter reached the Superior Court on a petition for writ of certiorari wherein the appellants were petitioners. That petition challenged the involved order of the respondent Board as having been rendered in excess of its jurisdiction. The final order of that court held that the Board had acted within its jurisdiction and had not abused its discretion. Thus the lower court affirmed the decisions of the Board and dismissed the appellants' petition.

The pertinent facts are as follows: the Arizona Ranch House Inn was a large old residence on North Central Avenue in Phoenix. The owners then began using the premises during the winter months as

a guest home. The facility at that time had less than twenty units. Also, meals were served to guests in a dining room with a capacity of approximately forty. The facilities were then expanded to include nearly twice the original number of apartment units and a dining room capacity for one hundred and fifty. At this time beer and wine were also served on the premises.

In April of 1959 this area was annexed to the City of Phoenix. Following the annexation the city zoned the entire area R–1 (single-family residential). The Arizona Ranch House Inn from the time of the annexation and zoning has occupied a status of nonconforming use in the R–1 area. Since that time there have been numerous hearings before city boards concerning the property with respect to expansion of these nonconforming uses and the propriety of certain allegedly "accessory" uses. In addition there was also a hearing, for a liquor license to serve spirituous liquors on the premises, held by the State Superintendent of Liquor Licenses and Control. While it appears that each such application before a city board was contested no lawsuit was filed during this time to review the actions of these city boards or of the State Superintendent of Liquor Control.

Thus gradually the character of the Arizona Ranch House Inn evolved from that of a residence to a guest house and finally to a restaurant-nightclub-apartment facility where live entertainment, patio parties, increased noise, lights and billboard advertising were much in evidence.

On February 15, 1962 the Phoenix City Building Inspector by letter notified the Arizona Ranch House Inn that, " * * * the use of a public bar and providing live entertainment on the Ranch House property is in violation of the zoning ordinances." The Phoenix Mayor on February 21, 1962 by letter also stated that the subject property was in violation of the zoning ordinances with respect to a public bar and live entertainment. With the validity of such uses thus at issue the cir-

cumstances were drastically changed by a fire which occurred on the premises of the subject property in August of 1962, destroying a major portion of the facilities.

This matter arises from the efforts of the ownership of the Arizona Ranch House Inn to reconstruct the premises after the fire. Pursuant to this intent an application was made to the Building Inspections Department of the City of Phoenix for the building permits necessary for the planned reconstruction. The application was denied by the Building Inspector because under the Phoenix zoning ordinances the reconstruction of the nonconforming use required a use permit from one of the Phoenix Adjustment Boards. An appeal of the denial was made to the Board. At the hearings conducted pursuant to the application the appellants appeared in opposition.

The Board conducted several hearings on this particular application and entered its decision and order granting the use permit for reconstruction of the nonconforming use in accordance with the plan and design submitted by the applicant subject to seven stipulations contained in the order. It appears that the order was a compromise determination allowing the applicant to rebuild and yet restricting the future use in order to placate the opposing neighbors.

The appellants contend that the Board exceeded its jurisdiction in a number of ways and that the Superior Court judgment was erroneous in affirming the Board determination. The contention in general is that the Board by its action sanctioned activity which, in effect, constitutes a complete rezoning of the subject property. That the only legal way in which the subject property could be put to the contested uses would be through a rezoning of the subject premises to a commercial category, such requiring a legislative act on the part of the Phoenix City Council. Therefore that if the Board's action is allowed to stand the zoning ordinances designed to protect residents and property owners in

the enjoyment of their rights becomes utterly meaningless and of no force and effect.

Specifically the appellants contend that the Board had no jurisdiction to grant a use permit without making a finding that the use covered by the permit would not be detrimental to the persons residing or working in the vicinity, to adjacent property, to the neighborhood or to the public welfare in general. Appellants contend there was no evidence to sustain such a finding. In searching the record we have found that several local property owners stated they felt that the complained of use would not depreciate their property or be detrimental to it. Specifically, one stated that she felt the rebuilding should not be opposed, that as far as the character of the neighborhood as an environment for her children she felt that it would not hurt or benefit them to have the building there. Another person who spoke stated that he and his brother who lived across the street from the Ranch House Inn had never been disturbed by anything on the subject premises and that they certainly were in favor of the reconstruction. Finally, another local resident said the only fault he saw with the area was that the building had burned down and not been reconstructed, feeling that the area should be built up. Further, one of the two neighbors who spoke in opposition stated that this group had not objected to the original operation but only now had objections to certain types of uses with particular regard to outside entertainment and use and the type of entertainment. In addition, the Board had before it the plans for the proposed reconstruction.

■ A Board cannot create jurisdiction by finding a fact upon which its jurisdiction depends without evidence in support thereof. Gibbons v. Finley, 77 Ariz. 391, 272 P.2d 610. Thus the sufficiency of evidence is properly reviewable on certiorari in determining whether jurisdictional facts were proved. Hunt v. Norton, 68 Ariz. 1, 198 P.2d 124, 5 A.L.R.2d 668.

So while this Court may not weigh the evidence introduced below on which a decision is based in order to determine the correctness of the decision reached it will consider such evidence in so far as it may tend to show jurisdiction or lack thereof to render the decision questioned by the certiorari decision. Civil Service Commission of City of Tucson v. Foley, 75 Ariz. 364, 257 P.2d 384.

■ In the instant matter we find there was sufficient evidence to support the necessary jurisdictional finding that the use covered by the permit would not be detrimental to the persons residing or working in the vicinity, to adjacent property, to the neighborhood or to the public welfare in general. Such is our determination in light of the circumstance of the presentation of divergent views by groups of neighbors, the qualified objections by the opposition neighbors who apparently took exception only to certain variations within a use category and the presence before the Board of the plans of the proposed reconstruction.

Next the appellants contend that the lower court erred in its judgment finding that the Board acted within its jurisdiction for the reason that the Board had no jurisdiction to grant a permit without making a finding that the use covered by the permit, the manner of conducting the same and any building involved will be in full conformity to any conditions, requirements or standards prescribed therefor by the Phoenix City Zoning Ordinance, § 109(b) 3.

The cited portion of the Phoenix City Code reads in pertinent part as follows:

"3. To hear applications for and to grant those special exceptions designated as use permits where required by this ordinance upon a finding by the board hearing, the application that the use covered by the permit, the manner of conducting the same, and any building which is involved will not be detrimental to persons residing or working in the vicinity, to adjacent property, to the neighborhood or the public welfare in general, and that the same will be in full conformity to any

conditions, requirements or standards prescribed therefor by this ordinance or pursuant thereto." § 109(b).

This Code section provides that the Board make a finding of fact. The Board in its final hearing of this cause ordered the granting of the requested permit based upon the

" * * * testimony and documentary evidence presented to this Board that the use permit requested for the reconstruction of the nonconforming use and the proposed manner of conducting the Arizona Ranch House Inn after reconstruction, as proposed, will not be detrimental to persons residing or working in the vicinity, to adjacent property, to the neighborhood, or the public welfare in general, and that therefore the use permit for reconstruction of the nonconforming use be granted, the use permit, however, subject to each and every one of the following stipulations * * *"

The stipulations provided in effect that: the signs would be limited to specified standards; there could be no outside serving of food or drink; there should be no loud-speakers outside, nor music or dancing; dancing be permitted with bands and vocalists connected with such bands, but that no featured stars or entertainment be otherwise permitted; there be no excessive exterior lights as to be incompatible with the surrounding residential area; there could be no activities in and around the pool area except for those activities normally associated with swimming; and that alcoholic beverage be served only in the dining room, lounge and banquet rooms as designated on the proposed plans; that reconstruction be in substantial compliance with the plans submitted by the applicant, that no alcoholic beverages be served in any area other than those previously designated and that there be no public bar.

■ To contend that because the Board did not state verbatim in its finding "that the same will be in full conformity to any conditions, requirements or standards prescribed therefor by this ordinance or pursuant thereto" such order is invalid, seems an unwarranted position in light of the Board determination. The order of the Board did not just grant permission for the reconstruction. Its order specified that the reconstruction and the use of the reconstructed premises would be subject to the above-stated stipulations. These stipulations show that the Board completely analysed the opposition's complaints, the legal implications and possible future conflicts over the use of the subject premises. Clearly any violation of the Board's order is something that may or may not take place in the future. In this matter the Board made its determination of the validity of the contested use and in so doing specified the limits of the use in all of the areas of known conflict. Thus we are obliged to find the Board, in effect, made its necessary determination that the use, the manner of conducting same and any building involved would be in full conformity to the conditions, requirements or standards prescribed by the Phoenix Zoning Ordinance.

The appellants next contend that it is clear from § 106(a) 5 of the Phoenix Zoning Ordinance that any nonconforming use which is damaged or destroyed may be restored or reconstructed subject to a use permit but only for the same use which existed on the subject property prior to the damage. That here a use permit was granted which authorized the construction of a larger structure and the conversion of residential units and offices into night-club and banquet areas contrary to what appellants contend constitutes a positive limitation on the Board in granting a use permit.

It was the position of the applicant Ranch House Inn before the Board, that,

"The total proposed reconstructed building external measurements would be 10,878 square feet as opposed to the 12,954 which Mr. Salome have had by 100% expansion, and as opposed to the 11,684 that was originally on the premises."

This position was controverted in part by the appellants. But it is apparent that prior

to the hearings in this matter the Ranch House Inn had at one time requested an expansion permit. Said permit was granted authorizing a 100% expansion of the use under § 106(a) 1 which states:

"A nonconforming use may be expanded subject to use permit within the confines of the lot or parcel of land upon which it is located at the time of enactment or amendment of this ordinance, provided, however, that the expansions shall not exceed an area equal to one hundred (100%) of the land area and/or building area being used for said nonconforming use at the time of enactment or amendment of this ordinance."

Further, no appeal of this expansion was taken by the opponents when it was granted several years prior to these hearings.

■■ There is of course a presumption of validity in favor of the Board's determination and one who attacks such decision is met with the presumption that it is correct and carries the burden of showing the decision to be against the weight of the evidence, unreasonable, erroneous, or illegal as a matter of law. Rathkopf, The Law of Zoning and Planning, Chap. 65, p. 27. We must conclude in reviewing this matter that the Board had sufficient evidence to sustain a determination that no expansion was at issue because of the original size of the facility. Thus we find against appellants even without reaching the question of the effect of the previous expansion permit in light of the reconstruction.

The next issue raised is whether the Board had the authority to allow the reconstruction of a nonconforming use which appellants contend was illegal. In order to determine whether the proposed reconstruction was allowable it must be decided if the reconstructed use would be within the realm of the valid, nonconforming uses that existed and any other accessory uses that might be incident thereto.

■■ The Phoenix Zoning Ordinance G–449, Chap. II defines an accessory use as:

"Accessory use. A subordinate use of a building, other structure, or use of land;

a. which is clearly incidental to the use of the main building, other structure or use of land, and

b. which is customary in connection with the main building, other structure, or use of land, and

c. which is located on the same zoned lot with the main building, other structure, or use of land."

We feel that some amount of latitude must be allowed a nonconforming use for reasonable expansion and the maintenance of accessory uses. In this matter what uses had been or were on the property, or could be expected on the property were matters of fact for the Board to determine. We cannot say as a matter of law that the nightclub-restaurant-apartment facility involved here could not be determined by the Board to be a reasonable and lawful expansion of the original nonconforming use, or that the objectionable nightclub use could not be held a valid accessory use to the otherwise unobjectionable nonconforming use.

■■ The policy choice of whether to allow the reconstruction of the premises, is not before us. It is our concern only to determine whether the lower court was correct in sustaining the jurisdiction of the Board. Thus the court,

"* * * will not substitute its judgment for that of the board, even where the question is faulty, debatable and one in which the court would have reached a different conclusion had it been the original arbitor of the issues raised by the application." Rathkopf, supra, Chap. 51, p. 1.

The most this Court may do with this matter is to determine if the trial court had grounds to sustain the Board's order. Thus it is not our place to weigh the evidence or to consider the probative force of conflicting testimony. To be justified in affirming the Board's order, aside from the previously discussed jurisdictional issues, the lower court must have found some evidence

which will support the Board's determination. Walker v. Dunham, 78 Ariz. 419, 281 P.2d 125; Hunt v. Norton, supra; Batty v. Arizona State Dental Board, 57 Ariz. 239, 112 P.2d 870. With the records of years of prior hearings, the opposing descriptions of past and proposed future uses on the subject premises, the plans for the proposed reconstruction, the testimony as to the effect on the neighborhood and its own concern for zoning development of the city we feel the Board had sufficient evidence at its disposal to allow it to make a fair and reasonable determination of the merits of the application for reconstruction permission. Thus we find that the Board's determination was correctly sustained by the lower court inasmuch as the evidence presented to the Board was capable of supporting a determination that the pre-fire use of the subject premises could legally be reinstituted subject to the provided-for stipulations.

Appellants contend that the Board by providing for the reconstruction of the premises and containing therein a specific authorization for signs to be placed upon the premises in compliance with the standards specified for the C-1 (commercial) district under the Zoning Ordinance exceeded its defined jurisdiction. We considered this contention with appellants' next point wherein it is alleged that the Board exceeded its authority in recognizing and permitting the continuous use of a No. 6 liquor license activity on the premises.

The basis for appellants' objection to the sign provision in the Board's order is that there appear to have been no commercial signs on the subject property prior to the date of annexation and thus appellants contend this sign cannot be recognized under any facet of the nonconforming use. As to the No. 6 liquor license appellants point out that the subject property did not at the time of annexation enjoy such a license, that under R-1 zoning the dispensing of hard liquor is not allowed aside from uses which may be nonconforming uses having had such status prior to annexation and thus the subject property was erroneously

authorized to continue the dispensing of hard liquors in violation of the zoning provisions.

The discussion of accessory uses stated above is pertinent in determining the validity of both the sign and hard liquor dispensing issues. The business sign is an integral part of a business. It would seem an extreme position to allow a business as a nonconforming use in a residential section and yet to say as a matter of law that since no sign existed at the time of annexation such business would not be allowed a sign to identify its location or advertise its wares. We hold this is not the law and further we note that appellants have not shown us any authority to this effect. Thus while the Board in allowing such signs should be cognizant of the effects that such may have on the area we must conclude that providing for these signs is not an act beyond the authority of the Board.

The Arizona Ranch House Inn served beer and wine before the time of annexation. Several years ago the proprietors of this property sought and obtained a hard liquor license. No persons made objection to the granting of this license or sought to avoid its use through legal remedies. Instead the appellants have now sought to disallow the use of this hard liquor license by convincing the Board and the courts that such is not encompassed in the nonconforming use. We find that the Board had the power, under the facts of this case, to allow any use which can validly be found accessory to the original nonconforming use. We conclude that the hard liquor license as a change from a beer-wine license was not such a radical change as to be found outside the scope of being accessory and thus we find the Board's authority properly exercised.

The appellants next raise the issue of the propriety of the hearings held in this matter in light of the fact that portions of the hearings were conducted in secret sessions closed to the public. Such action appellants contend should invalidate the ulti-

mate order of the Board. We do not agree. The record of the hearings shows that the objected-to secret sessions were a recess and a deliberating session amongst the members of the Board with no other persons present. The many hearings conducted in this matter were open to the public, there was ample opportunity for interested persons to present any and all evidence and argument and the final action of the Board was adopted at an open hearing with all parties present. Thus appellants' position that the Board's action should be voided cannot be sustained.

Appellants' final contention relates to the action of the Superior Court in dealing with appellants' notice of appeal, supersedeas bond and its own order staying further proceedings by the Board.

On March 11, 1964 the Superior Court made its minute entry with findings ordering that the Board determination be affirmed and the petition for certiorari be dismissed. Motion to vacate same was made and denied. At this time the Board was in session relative to the issuance of the final building permits. Appellants then filed their notice of appeal and supersedeas bond. The court then entered its order staying any future hearings pending disposition of the matter on appeal. The Board moved to vacate such order and to dismiss the notice of appeal. Appellants appeared and argued that the lower court had lost jurisdiction of the matter. The Board contended that the court had wrongfully entered a stay order when there had been no supersedeas bond properly filed and/or no proper entry of judgment. The lower court felt there had in fact been no entry of judgment nor proper filing and acceptance of bond and that the court had not as yet lost jurisdiction and therefore it proceeded. Thus the lower court issued an order dismissing the notice of appeal and revoking its order staying the proceedings. Appellants then refiled their notice of appeal and again posted bond that the matter be brought before this Court. The appellants did not seek to sustain their original notice

of appeal and bond or the stay order which the lower court had at one point granted. Instead they immediately refiled their notice and again posted bond. Therefore this matter is before us on the latter notice of appeal. As a consequence the question offered as to the lower court's treatment of the first notice of appeal, supersedeas bond and its stay order has become moot.

A question is moot if it seeks to determine an abstract problem which does not arise upon existing facts or rights. Such is the case with the issue at hand. Thus we find ourselves compelled to follow the general rule that an appellate court need not decide moot questions or abstract propositions. Southwest Engineering Co. v. Ernst, 79 Ariz. 403, 291 P.2d 764; State ex rel. Sullivan v. Patterson, 64 Ariz. 40, 165 P.2d 309; State ex rel. Brawner v. Kerby, 32 Ariz. 118, 256 P. 113; Harrison v. Hunt, 28 Ariz. 75, 235 P. 158; Mesa Mail Pub. Co. v. Board of Supervisors, 26 Ariz. 521, 227 P. 572; Francis Construction Co. v. Pima County, 1 Ariz.App. 429, 403 P.2d 934. Therefore we decline to consider the merits of this particular issue.

Judgment of the lower court affirmed.

BERNSTEIN, C. J., McFARLAND, V. C. J., and LOCKWOOD, J., concur.

STRUCKMEYER, Justice (dissenting).

I cannot let the decision of the majority pass without expressing both disagreement with their conclusions and my dissatisfaction with the action of the Adjustment Board of the City of Phoenix in granting a use permit for a night club type business in the center of one of the finest residential areas of the City of Phoenix.

The Ranch House Inn was originally an expensive home like other property on Central Avenue. As the attorney for appellants stated in his opening remarks to the City of Phoenix Adjustment Board:

"[T]o the north we have homes all up Central Avenue in the $50,000 to $75,000 category; * * * Immediately contiguous to the back of the property and

west, we have homes in approximately the $30,000 category. Immediately to the south, we have homes in approximately the $25,000 to $30,000 category, immediately adjacent. Across the street, we have homes in the $30,000 to $40,000 category * * *."

In 1958, the owner of the Ranch House Inn rented seventeen rooms as a winter resort and apparently, principally for the convenience of his guests, operated a small dining room of eight tables with a seating capacity of forty-three people. That year the property was sold and the new owner, just prior to the annexation of the area by the City of Phoenix in April of 1959, doubled the rentals to thirty-four units and increased the dining room from 43 to 150 seating capacity. After annexation the owner applied to double the size of his operation under the permissive expansion of nonconforming uses section of the Phoenix Zoning Ordinance, § 106(a)1. This was granted by the Adjustment Board although the use had already been more than doubled shortly before while the property was under county zoning, see Hart v. Bayless Inv. & Trading Co., 86 Ariz. 379, 346 P.2d 1101, and although the Phoenix ordinance required a finding that the use was not detrimental to adjacent property and the neighborhood.

In 1961, again with the knowledge and permission of the Adjustment Board, the use was further expanded. A hard liquor license was authorized for the premises and immediately a service bar and cocktail lounge, with public dancing, also specifically authorized by the Board, and Las Vegas type entertainment, were instituted. At various times billboards were put out in front of the premises with search lights; parties were held around a swimming pool until 1:00 o'clock a. m. with the pool itself open to the public; Kleig lights and outdoor electrical signs were erected stating "Hotel" and "Lobby".

So, within a short space of time, the modest establishment once known as the Ranch House Inn, its name now changed to the Ralph Gaines Colony Steak House, increased its dining capacity from 8 tables to 300 people and wholly altered its character to a night club type of operation. All this was imposed upon the people of this residential area while under either county or muncipal zoning and, of course, contrary to the spirit and purpose of all zoning. It must be emphasized that not only was the nonconforming use increased contrary to the law cited hereinafter but the very nature of the business was changed from a modest winter resort inn to a Las Vegas type roadhouse.

The intent, purposes and objectives of zoning have been discussed by the courts of nearly every state and are well understood. That there be no misunderstanding as to the nature of the legal rights here involved, I extensively quote the views of the Supreme Court of California:

"The rights of users of property as those rights existed at the time of the adoption of a zoning ordinance are well recognized and have always been protected. Yokley, Zoning Law and Practice, § 132, p. 255. Accordingly, a provision which exempts existing nonconforming uses is ordinarily included in zoning ordinances because of the hardship and doubtful constitutionality of compelling the immediate discontinuance of nonconforming uses. County of San Diego v. McClurken, 37 Cal.2d 683, 686, 234 P.2d 972. However, the continued nonconforming use must be similar to the use existing at the time the zoning ordinance became effective, see Rehfeld v. City and County of San Francisco, 218 Cal. 83, 21 P.2d 419; City of Yuba City v. Cherniavsky, 117 Cal.App. 568, 4 P.2d 299, and in determining whether the nonconforming use was the same before and after the passage of a zoning ordinance, each case must stand on its own facts. Yokley, Zoning Law and Practice, § 135, p. 261.

\* \* \* \* \* \*

"The purpose of zoning in effecting the crystallization of present conditions and the constructive control of future development was recognized in the case of City of Yuba City v. Cherniavsky, supra, 117 Cal.App. 568, at page 573, 4 P.2d 299, at page 301, where it was stated: 'If there is no limitation upon the character or location of a nonconforming business, so long as it is located on the same lot where it formerly existed, then one may abandon an inexpensive notions counter which was maintained prior to the adoption of a zoning ordinance, and construct in lieu thereof an elaborate mercantile establishment at the opposite end of the same lot, at an unlimited expense, and thus circumvent and destroy the very purpose of the ordinance.'

"There is little difference in principle between enlarging a grocery business through relocation on a different part of the same property, as was the situation in the cited Yuba City case, and enlarging a trailer court business through the addition of trailer units for the housing of more people. In either situation the enlargement of the nonconforming business would involve a detrimental effect on surrounding property values in a residential area, as well as conflict with the purpose of zoning to restrict rather than extend the 'existing' nonconforming use. In Pisicchio v. Board of Appeals of Village of Freeport, 165 Misc. 156, 300 N.Y.S. 368, at pages 369–370, it was appropriately said: 'Unless owners of nonconforming uses in zoning areas are required to adhere to the excepted use in volume of trade as well as character of business, zoning laws will be rendered ineffectual and such favored parcels of property will assume great values based not upon a natural growth, but upon the right of the owner to extend and enlarge the existing nonconforming use." Edmonds v.

Los Angeles County, 40 Cal.2d 642, 255 P.2d 772, 777, 778.

It should be repeated; *the spirit underlying zoning is to restrict rather than to increase nonconforming uses.* To that end it has been held by the most respected courts in the country that nonconforming uses are to be eliminated as rapidly as possible. They are not to be rebuilt or renewed and statutes permitting nonconforming uses are to be strictly construed against the nonconforming user. See Baccante v. Zoning Bd. of Appeals of City of Bridgeport, 153 Conn. 44, 212 A.2d 411; DeForest & Hotchkiss Co. v. Planning and Zoning Commission of Town of Madison, 152 Conn. 262, 205 A.2d 774; Franklin Planning and Zoning Commission v. Simpson County Lumber Co., Ky., 394 S.W.2d 593; Building Inspector of Malden v. Werlin Realty, Inc., 349 Mass. 623, 211 N.E.2d 338; Inhabitants of Town of Windham v. Sprague, Me., 219 A.2d 548; South Central Imp. Ass'n v. City of St. Clair Shores, 348 Mich. 153, 82 N.W.2d 453.; Arsenault v. City of Keene, 104 N.H. 356, 187 A.2d 60.; Borough of Demarest v. Heck, 84 N.J.Super. 100, 201 A.2d 75.; Betts v. Board of Adjustment of City of Linden, 72 N.J.Super. 213, 178 A.2d 209; Hantman v. Randolph Tp., 58 N.J.Super. 127, 155 A.2d 554; Franmor Realty Corp. v. LeBoeuf, 201 Misc. 220, 104 N.Y.S.2d 247, affirmed 279 App.Div. 795, 109 N.Y. S.2d 525, appeal denied 279 App.Div. 874, 110 N.Y.S.2d 910.

For example, the Supreme Court of Connecticut stated, in Farr v. Zoning Board of Appeals of Town of Manchester, 139 Conn. 577, 587, 95 A.2d 792, 796:

"It is a fundamental principle of zoning that, while it is deemed necessary to permit the continuance of nonconforming uses which existed when the zoning regulations were adopted, the aggregate extent of such uses is to be reduced as rapidly as destruction of the property * * * occurs."

For, as the Maine Court said in Inhabitants of Town of Windham v. Sprague, supra:

> "Nonconforming uses are a thorn in the side of proper zoning and should not be perpetuated any longer than necessary." 219 A.2d 548, 552.

The powers of the Board of Adjustment of the City of Phoenix are set forth in Section 109 of its Zoning Ordinance G–449. Paragraph (b)3 of Section 109 provides that the Adjustment Board may:

> "grant those special exceptions designated as use permits * * * upon a finding by the Board * * * that the use covered by the permit, the manner of conducting the same, and any building which is involved will not be detrimental to persons residing * * * in the vicinity, to adjacent property, to the neighborhood * * *."

The ordinance also provides that the burden of proof for satisfying these requirements "shall rest with the applicant."

As to the burden of proof, this is the evidence upon which the Adjustment Board acted in granting a use permit under Section 109:

1. A Mrs. Sobol, who lived at least three blocks away stated to the Board, "I am not opposed to the rebuilding of the Ranch House Inn * * * My children, I feel, are living in an excellent area, and I feel that it will not hurt them, nor will it benefit them, to have this structure there.*

2. A Mr. Rosenberg, who lived more than five blocks away but who at that time did not even own a home in the area, stated: "One of the reasons I am here is because of Ted Schafer because we are both at the school together at Madison Meadow. He's the coach of the kids on the peewee league, and I feel his character should come before any type of this belly dancing which some may have in the back of their mind because I know we are against that; * * *." *

3. A Mr. Rabin said that he and his brother lived across the street from the Ranch House Inn. They liked night clubs. "* * * we have enjoyed the entertainment over there many times. We've had parties of our own at our own home and have never been disturbed by

---

* Since from this and the subsequent two witnesses the majority are able to find that the use would not be detrimental to persons, adjacent property or the neighborhood, their testimony is set out verbatim.

1. "My name is Mrs. Samson Sobol, and I live at 317 West Montebello. And I really wasn't going to say anything until Mrs. McGinty sort of made my feminine dander rise. We live in this area, and we have children. We are home owners, and I certainly do not approve of the existence of anything in an area which creates any sort of discord with the mores of the community. I am not opposed to the rebuilding of the Ranch House Inn as it is proposed by Mr. Burch and the owners. My children, I feel, are living in an excellent area, and I think that it will not hurt them, nor will it benefit them, to have this structure there."

2. "My name is Lewis Rosenberg, and I reside at 509 West Solano Drive in the area, and I have two children who go to

the Madison Meadows School, and we are on the verge of purchasing a home in the area now. We have lived there approximately a year and that is just about getting ready to go into escrow. The only fault that we have found is that the building is burned down, and the people who visit us has made comment on it, and I was shocked listening to these speakers because it frightened me on whether we wanted to stay in the neighborhood. But we have found the neighbors very nice, and we have found the neighborhood very nice, and I feel the area should be built up. One of the reasons I am here is because of Ted Schafer because we are both at the school together at Madison Meadow. He's the coach of the kids on the peewee league, and I feel his character should come before any type of this belly dancing which some may have in the back of their mind because I know we are against that; but we are for rebuilding the area and hoping that their character will maintain a proper restaurant."

anything there. * * * It's a night club like all night clubs that we have today, and I think it would be a good thing to continue, * * * " **

Other than the architects' plans for re-building the structure destroyed by fire, the foregoing is the whole of the evidence upon which the Board of Adjustment made a determination that this night club would not be detrimental to the adjacent property and to the neighborhood. The statements—relied on by the majority—of three persons out of an entire area that they are not opposed to or would like to see this night club rebuilt is not evidence that the use would not depreciate the adjacent property or be detrimental to the neighborhood.

A more blatant example of the thwarting of the purposes of zoning by the inroads of a nonconforming use can hardly be found. This community of fine homes has been downgraded to the detriment of its inhabitants and the whole of the City of Phoenix because, in the language of the Supreme Court of California, this favored parcel of property has been allowed to assume a great value based not upon its natural growth but upon the right of the owner to extend and enlarge the existing non-conforming use.

The Adjustment Board, it should be stated, sought to soften the impact of this business of drinking and continuous carousal, so obnoxious to so many people, by placing conditions upon the use of the premises, such as, no excessive exterior lights, outside loud speakers or outside serving of food and drink. This begs the real issue. The Adjustment Board only has jurisdiction to grant a use permit if there is reasonable evidence that the use and the buildings involved will not be detrimental to adjacent property and to the neighborhood. I am unable to find one iota of reasonable evidence to support such a determination. Nor am I able to find any provision in the Phoenix Zoning Code which permits such a change in a nonconforming use as has here occurred—a change from an inn providing meals for its guests at reasonable hours to a night club, roadhouse type establishment serving liquor and entertainment indiscriminately to the public. I think it is outrageous.

The action of the Adjustment Board was arbitrary and capricious. This Court should direct that the use permit be forthwith cancelled, with instructions to grant as a maximum such a permit as is consistent with the use made of the premises at the time the property was annexed into the City of Phoenix, and no more. This means that the hard liquor and entertainment should be eliminated and food should be served only at the usual mealtime hours.

** 3. "My name is Mr. Meyer Rabin, and my brother lives across the street from the Ranch House Inn, and we have enjoyed the entertainment over there many times. We've had parties of our own at our own home and have never been disturbed by anything there. We certainly would like to have it rebuilt because it certainly isn't good for the area the way, in the condition that it's in now. The reason he isn't here is that he's out of town on vacation now, and I thought that I would come down and say these things that I'm sure that he would say. We've never been disturbed by any noises over there. It's a night club like all night clubs that we have today, and I think it would be a good thing to continue, and we certainly need the, these lodge accommodations somewhere in that area for guests and people that come into town to visit."